UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ROBERT S.,                                        )
                                                  )
                        Plaintiff,                )
                                                  )
            v.                                    )      No. 1:20-cv-03095-TWP-DLP
                                                  )
KILOLO KIJAKAZI,                                  )
                                                  )
                        Defendant.                )

## REPORT AND RECOMMENDATION

Plaintiff Robert S. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d), 1383(c)(3).

On October 6, 2021, United States District Judge Chief Tanya Walton Pratt entered an Order referring this matter to the Undersigned for a report and recommendation regarding the appropriate disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 15). For the reasons set forth below, the Undersigned recommends that the Commissioner's decision denying the Plaintiff benefits be **REVERSED** and **REMANDED** for further proceedings.

## I.    PROCEDURAL HISTORY

On March 23, 2016, Robert filed his application for Title II DIB benefits. (Dkt. 10-5 at 2-5, R. 178-181). Robert alleged disability resulting from a stroke and headaches. (Dkt. 10-6 at 8, R. 207). The Social Security Administration ("SSA")

denied Robert's claim initially on September 13, 2017, (Dkt. 10-3 at 14, R. 83), and on reconsideration on March 7, 2018. (Id. at 28, R. 97). On April 20, 2018, Robert filed a written request for a hearing, which was granted. (Dkt. 10-4 at 22-23, R. 118-19).

On January 28, 2020, Administrative Law Judge ("ALJ") Elias Xenos conducted a hearing, where Robert appeared by video and vocational expert Diane Regan appeared by telephone. (Dkt. 10-2 at 39-68, R. 38-67). On February 26, 2020, ALJ Xenos issued an unfavorable decision finding Robert was not disabled. (Dkt. 10-2 at 22-34, R. 21-33). Robert appealed the ALJ's decision and, on October 5, 2020, the Appeals Council denied Robert's request for review, making the ALJ's decision final. (Dkt. 10-2 at 2-5, R. 1-4). Robert now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    STANDARD OF REVIEW

To qualify for Title II DIB, a claimant must be disabled within the meaning of the Social Security Act. To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The SSA has implemented these

2

statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a). The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then he must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1520. (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine

whether the claimant can perform his own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id*. The Commissioner must then establish that the claimant – in light of his age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Robert is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to [her] conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in his decision, but he cannot ignore a line of evidence that undermines the conclusions he made, and he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.    BACKGROUND

#### A. Factual Background

Robert was thirty-three years old as of his October 23, 2016 alleged onset date. (Dkt. 10-6 at 5, R. 204). He has completed high school. (Dkt. 10-2 at 45, R. 44). He reported past relevant work as a machinist and trailer assembler. (Dkt. 10-2 at 32-33, R. 31-32).

#### B. ALJ Decision

In determining whether Robert qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and concluded that Robert was not disabled. (Dkt. 10-2 at 22-34, R. 21-33). At Step One, the ALJ found that Robert had not engaged in substantial gainful activity since his alleged onset date of October 23, 2016. (Id. at 24, R. 23).

At Step Two, the ALJ found that Robert suffered from the following severe impairments: headache syndrome; migraine headaches; cerebral vein thrombosis; adjustment disorder with mixed anxiety and depressed mood; attention deficit hyperactivity disorder (ADHD); panic attacks; and unspecific neurocognitive disorder. (Id. at 24-25, R. 23-24).

At Step Three, the ALJ found that Robert's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. (Id. at 26-28, R. 25-27). The ALJ determined that Robert physical impairments did not meet or medically equal the severity of Listing 11.02 for seizure disorders. (Id.). The ALJ further determined

that Robert's mental impairments, considered singly and in combination, did not meet or medically equal the severity criteria of Listings 12.02, 12.04, or 12.06. (Id.). As for the "paragraph B" criteria, the ALJ found that Robert had mild limitations with understanding, remembering, or applying information and interacting with others; moderate limitations with adapting or managing oneself; and marked limitations with regard to concentrating, persisting, or maintaining pace. (Id.).

After Step Three but before Step Four, the ALJ found that Robert had the residual functional capacity ("RFC") to perform light work, except that he: can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can frequently balance, stoop, crouch, crawl, and kneel; may never work around unprotected heights or hazardous machinery; may never work outdoors in bright sunshine or with bright or flickering lights, such, as would be experienced in welding or cutting metals; may never have concentrated exposure to extreme heat; can occasionally tolerate lights bright than typically found in office or retail environments; can tolerate moderate levels of noise; is limited to simple, routine tasks in a work environment free of fast-paced production requirements, involving simple, work-related decisions, with few, if any , work-place changes; and would be off-task 10% of the workday over and above normally scheduled breaks. (Dkt. 10-2 at 28, R. 27).

At Step Four, the ALJ concluded that Robert is not able to perform any of his past relevant work. (Id. at 32, R. 31).

At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Robert's age, education, work experience, and residual functional capacity, he was capable of adjusting to other work. (Id. at 33-34, R. 32-33). The ALJ concluded that Robert was not disabled. (Id. at 32, R. 33).

## IV.  ANALYSIS

Robert raises three challenges to the ALJ's decision, namely: (1) at Step Three, the ALJ erred in assessing whether his headaches met or medically equaled Listing 11.02; (2) the ALJ's determination that Robert would be off-task 10% of the workday and the hypothetical to the vocational expert were not supported by substantial evidence; and (3) the ALJ conducted an improper 16-3p credibility analysis. (Dkt. 12 at 4)[1]. The Court will consider these arguments in turn below.

### A. Listing Determination

Regarding the Step Three determination, Robert maintains that the ALJ erred when he failed to adequately analyze whether Plaintiff's headaches medically equaled the requirements of Listing 11.02. (Dkt. 12 at 12-22). In response, the Commissioner maintains that the ALJ's findings were supported by substantial evidence. (Dkt. 13 at 8-12).

Under Step Three of the sequential evaluation process, if a claimant has an impairment that meets or medically equals the criteria of an impairment found in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, the

---

[1] The paginated numbers provided at the bottom of Plaintiff's Opening Brief do not correspond with the paginated numbers of the brief on the Docket. The Undersigned has chosen to cite to the paginated numbers from the Docket.

claimant is presumptively disabled and qualifies for benefits. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). The Listings specify the criteria for impairments that are considered presumptively disabling. *Minnick*, 775 F.3d at 935 (citing 20 C.F.R. § 404.1525(a)). A claimant may also demonstrate presumptive disability by showing that his impairments are accompanied by symptoms that are equal in severity to those described in a specific listing. *Id.* (citing 20 C.F.R. § 404.1526).

It is the claimant's burden to prove that his condition meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment with medical findings. *Minnick*, 775 F.3d at 935; *Sims*, 309 F.3d at 428; *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Medical equivalence is based upon medical findings and the opinion of "one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R § 404.1526(b)–(c); see also *Barnett*, 381 F.3d at 670 ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue.").

Social Security Ruling 19-4p addresses primary headache disorders (including migraines and cluster headaches), and indicates that they should be evaluated under Listing 11.02, which requires the following, in relevant part:

> B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

> 1. Physical functioning (see 11.00G3a); or
> 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
> 3. Interacting with others (see 11.00G3b(ii)); or
> 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> 5. Adapting or managing oneself (see 11.00G3b(iv)).

*Disability Evaluation Under Social Security: 11.00 Neurological Listings*,

https://www.ssa.gov/disability/professionals/bluebook/11.00-Neurological-Adult.htm#11_02 (last visited January 25, 2022). SSR 19-4p also provides the following guidance on considering medical equivalence of headaches to Listing 11.02:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: a detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

> Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider

10

> for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

SSR 19-4p. As noted in SSR 19-4p, there is no listing for headaches or migraines, so the SSA "routinely considers these impairments under the criteria for Listing 11.03," which is now 11.02.[2] *Cooper v. Berryhill*, 244 F. Supp. 3d 824, 828 (S.D. Ind. 2017). "A claimant may therefore demonstrate equivalence to Listing [11.02] by showing that his migraines cause functional impairments equivalent to those described in the Listing." *Id.* at 828-29. "Courts analyzing migraine headaches under listing 11.02 have found that equivalence can be shown where migraines occur at these time intervals despite prescribed treatment." *Corey Z. v. Saul*, No. 18 CV 50219, 2019 WL 6327427, at *4 (N.D. Ill. Nov. 26, 2019) (citing *Snow v. Berryhill*, No. 3:18-CV-434 JD, 2019 WL 1873551, at *4, (N.D. Ind. Apr. 26, 2019) (reversing and remanding the ALJ's perfunctory listing 11.02 analysis because there was evidence that the plaintiff experienced migraine headaches fifteen days of every month, her medications generally did not help, her migraines were exacerbated by noise, she could only obtain relief by trying to sleep, and she received injections and nerve blocks for her headaches); *Kaiser v. Colvin*, No. 1:14-cv-01480-SEB-MJD, 2015 WL 4138263, at *6, 2015 U.S. Dist. LEXIS 89115, at *16-17 (S.D. Ind. June 18, 2015) (reversing and remanding for similar reasons, finding

---

[2] The rule that replaced Listing 11.03 with Listing 11.02 took effect on September 29, 2016, and applies to all applications that were pending on or after that date. *See Woods v. Saul*, No. 19-CV-1586-SCD, 2020 WL 6111636, at *3 n.24 (E.D. Wis. Oct. 16, 2020).

that Plaintiff experienced chronic migraine headaches once or twice a week lasting up to three days, she tried a wide array of prescription medications to resolve her headaches, her migraines were accompanied by pounding, photophobia, and phonobia, and she explained that she goes into a room to lie down until the pain passed); *Kwitschau v. Colvin,* No. 11 C 6900, 2013 WL 6049072, at *3 (N.D. Ill. Nov. 14, 2013) ("In order to meet that Listing, Claimant must suffer from more than one medically severe migraine headache per week despite at least three months of prescribed treatment").

In Plaintiff's counsel's opening statement at the hearing, she noted for the ALJ that the main argument of this case is medical equivalence with Listing 11.02. (Dkt. 10-2 at 42-44, R. 41-43). In response, the ALJ stated: "[s]o you're equating the seizures with the headaches? We're not dealing with seizures . . . ." (Dkt. 10-2 at 43, R. 42). In his opinion, the ALJ gives a perfunctory statement that the claimant does not equal a listed impairment, including Listing 11.02, lists the full text of Listing 11.02, and then states: "Here, while the record finds claimant with difficulties with attention and concentration, the record does not contain any evidence of seizure activity or treatment for seizures as required by the listing (Exhibit 1F to 15F). SSR 19-4p was also considering in addressing claimant's headaches." (Dkt. 10-2 at 26, R. 25). Plaintiff, however, never argued that he *meets* Listing 11.02, because he acknowledges that he does not have seizures; instead, Plaintiff has always maintained that he *medically equals* Listing 11.02, and points to the record evidence to support said medical equivalence in his brief. (Dkt. 12 at 15-22). The

12

ALJ stated that he considered SSR 19-4p, but engaged in no such discussion or analysis; this is particularly troubling given Plaintiff's counsel's opening statement at the hearing alerting the ALJ to the Plaintiff's medical equivalence argument.

The Commissioner does not directly address Plaintiff's argument regarding medical equivalence; instead, the Commissioner contends that the ALJ's analysis was sufficient and supported by the state agency reviewing physicians' opinions, and that Plaintiff never explains how he medically equals Listing 11.02. (Dkt. 12 at 8-12). First, the ALJ's analysis is perfunctory. While the ALJ found that the Plaintiff's stated impairments did not meet Listing 11.02 (Dkt. 10-2 at 26, R. 25), the ALJ failed to offer any analysis of whether Plaintiff's impairments medically equaled Listing 11.02. *See Corey Z.*, 2019 WL 6327427, at *3 (citing *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) ("[i]n considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing.")).

Second, although the state agency reviewing physicians did conclude that Robert had no impairment that met or medically equaled a listing, the Disability Determination & Transmittal forms do not suggest that those physicians considered Listing 11.02, and instead indicate that the physicians only considered Robert's headaches under Listing 11.04 for his history of stroke. (Dkt. 10-3 at 8, 14, 22, 28, R. 77, 83, 91, 97). Furthermore, even if the state agency reviewing physicians had considered Listing 11.02 without noting such consideration, they provided no explanation or analysis, making judicial review all but impossible. *See Corey Z.*,

2019 WL 6327427, at *4. Perhaps more importantly, the ALJ never indicated that he was relying on the state agency opinions when concluding that Robert's headaches do not meet or medically equal Listing 11.02. *See Woods v. Saul*, No. 19-CV-1586-SCD, 2020 WL 6111636, at *6 (E.D. Wis. Oct. 16, 2020) (discounting Commissioner's argument where the ALJ did not rely on state agency physicians' opinions in making Listing determination); *Lister v. Saul*, No. 4:20-CV-18-HAB, 2021 WL 3088706, at *4 (N.D. Ind. July 22, 2021) (same).

The Commissioner also incorrectly states that the Plaintiff does not provide a valid basis for how he meets or medically equals Listing 11.02. To the contrary, the Plaintiff lists the medical evidence to demonstrate potential medical equivalence to Listing 11.02(B) and the medical evidence along with the ALJ's finding of a marked limitation to demonstrate potential medical equivalence to Listing 11.02(D). (Dkt. 12 at 18-19). Specifically, the Plaintiff alleges the following information supports his contention that he has either one medically severe headache per week to satisfy Listing 11.02(B) or one medically severe headache every two weeks and one marked limitation in an area of functioning to satisfy Listing 11.02(D):

> Evidence supports equaling listing 11.02(B), as Sutton experiences his cluster headaches several times a day, every day, despite treatment. Even with the occasional improvements, he still at least equals required frequency of events. Further, the ALJ has, already concluded that Sutton has marked limitation with regard to concentrating, persisting, or maintaining pace. [Dkt. 10-2 at p.27, R. 26].

> The best he was doing was prior to the alleged onset date when he reported only one or two headaches a month. [Dkt. 10-7 at p.7, R. 335]. Thereafter they began to worsen, and he reported getting a bad headache that lasts two to three days every few months. [Dkt. 10-7 at p.64, R. 330]. He once went sixteen hours without any headaches, but

14

> normally has them daily. [Dkt. 10-7 at p.59, R. 325]. Even though he reported some improvement, he still had daily headaches, and still had occasional severe ones. [Dkt. 10-7 at p.54, R. 320]. He next reported he averages four headaches per day, every day, lasting anywhere from five to fifteen minutes, or sometimes several hours. [Dkt. 10-6 at p.3, R. 202; Dkt. 10-7 at pp.4, 90, 125, R. 270, 356, 391]. He later reported that the longest he has gone without any headaches is one and a half weeks. [Dkt. 10-7 at p.139, R. 405]. After starting a new medication, he noted that the frequency of his headaches had decreased (they used to be three to four times a day, but improved to three to four times a week with one particularly severe one a week), but their severity was more intense. [Dkt. 10-7 at pp.129, 133, R. 395, 399]. At the hearing he testified he has on average three headaches a day, lasting from a few minutes to three hours. [Dkt. 10-2 at p.52, R. 51]. His headaches are associated with nausea, light sensitivity, and noise sensitivity. [Dkt. 10-7 at pp.56, 59, 69, 90, 125, R. 322, 325, 335, 356, 391]. They can be triggered by heat, stress, strobing lights, and high pitched noise. [Dkt. 10-2 at p.59, R. 58; Dkt. 10-7 at pp.4, 90, R. 270, 356]. After some of the headaches he is exhausted and has to sleep. [Dkt. 10-7 at p.4, R. 270]. He has been treated for years with a variety of medications including Tramadol, Fioricet with codeine, Topamax, Protonix, Amitriptyline, Imitrex, Verapamil, triptans (he usually reported "tryptophans"), Ajovy, and oxygen. [Dkt. 10-2 at p.60, R. 59; Dkt. 10-6 at p.3, R. 202; Dkt. 10-7 at pp.4, 54, 55, 56, 59, 60, 69, 70, 125, 127, 129, 134, 139, R. 270, 320, 321, 322, 325, 326, 335, 336, 391, 393, 395, 400, 405].

(Dkt. 12 at 18-19). Robert has thus pointed to significant evidence in the record, both from his own testimony and also from his medical records, that demonstrate his headaches were severe, with symptoms such as nausea, photophobia, sonophobia, and fatigue; triggered by heat, stress, strobing lights, and high-pitched noises; and treated with a wide array of medications over the years. (Dkt. 12 at 18-19). Plaintiff need only show that he has suffered one medically severe headache per week, or one medically severe headache every other week along with a marked limited in one of the four functional "paragraph B" criteria. The ALJ has already concluded that Robert has a marked limitation in concentrating, persisting, and

15

maintaining pace, largely due to the symptoms caused by his headaches; thus, an individual, like Robert, who has presented credible testimony that he suffers severe headaches at least once per week could medically equal Listing 11.02. Therefore, the ALJ's failure to consider medical equivalence is not harmless and this matter should be remanded for further proceedings, so that the ALJ can properly assess whether Plaintiff meets or medically equals Listing 11.02.

### B. Off-Task Limitation

Next, Plaintiff argues that the ALJ's RFC determination that he would be off-task for 10% of the workday was not supported by substantial evidence, which in turn led to a faulty hypothetical presented to the vocational expert. (Dkt. 12 at 23-28). The Commissioner maintains that this limitation was the result of the ALJ's analysis and supported by substantial evidence. (Dkt. 13 at 14-15).

During the "paragraph B" criteria analysis at Step Three, the ALJ concluded that Robert had a moderate limitation in adapting or managing himself, because he had been found to have below average stress tolerance. (Dkt. 10-2 at 27, R. 26). The ALJ also found that Robert had a marked limitation with concentrating, persisting, or maintaining pace, because Robert stated the ability to pay attention for only a few minutes and that he usually does not finish what he starts and gets distracted easily, along with the fact that in a mental status examination he was found with sporadic and below average attention. (Id.). In his RFC, the ALJ stated that "[d]ue to recurrent headaches and abnormally frequent restroom use, [Robert] would be off-task 10% of the workday over and above normally scheduled breaks." (Dkt. 10-2

at 28, R. 27). At the hearing, the ALJ presented one hypothetical (the same one ultimately used by the ALJ in his opinion) with a limitation of 10% off-task above regularly scheduled breaks, to which the vocational expert responded that there would be jobs available in the national economy. (Dkt. 10-2 at 65-67, R. 64-66). The ALJ then asked the vocational expert the effect of an increase to being off-task 20% above normally scheduled breaks – the vocational expert testified that no competitive employment would be available. (Dkt. 10-2 at 67, R. 66). There is no other discussion of a percentage that Plaintiff would be off-task during the hearing or in the ALJ's opinion.

An ALJ "must build an accurate and logical bridge between an off-task percentage incorporated into the RFC and the record evidence." *G.S. v. Kijakazi*, No. 3:20-CV-50232, 2021 WL 6201303, at *5 (N.D. Ill. Dec. 20, 2021) (citing *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017)). Here, the ALJ included an off-task limitation but provided no explanation as to how that limitation was grounded in evidence or was sufficient to accommodate the assigned functional limitations of recurrent headaches and abnormally frequent restroom use. As Plaintiff points out, this case is markedly similar to *Harris v. Saul*, No. 18-CV-1930, 2020 WL 221964, at *3 (E.D. Wis. Jan. 15, 2020) and *Garner v. Berryhill*, Civil No. 1:18-cv-211, 2019 U.S. Dist. LEXIS 48653, 2019 WL 1324605, at *26-30 (N.D. Ind. Mar. 22, 2019), along with the many cases cited in *G.S. v. Kijakazi*, 2021 WL 6201303. Moreover, the Commissioner never rebuts the Plaintiff's contention, and instead argues that

the Plaintiff has failed to show that he needed more time off-task than the ALJ found in his opinion. (Dkt. 13 at 15).

The ALJ already determined that Robert has a marked limitation with respect to concentration, persistence, and maintaining pace, and accepted Robert's allegations that he must use the restroom with "abnormal" frequency throughout the day, so it is not at all clear why a 10% off-task limitation would address Robert's symptoms. Because the record also supports Robert's argument that a 10% off-task limitation may not be sufficient to address his symptoms, the ALJ needed to explain how he determined that being allowed to be off-task 10% of the workday was sufficient to accommodate Robert's limitations. For example, at Robert's mental status exam with the state agency psychological consultant, Dr. Karl Evans, Robert's mood was mildly depressed; his affect was anxious; he was fidgety; and he talked a lot, which affected his concentration. (Dkt. 10-7 at 86-87, R. 352-53). Dr. Evans found that Robert's mental calculation was below average, his attention was sporadic, and his excessive talking tended to distract him, all of which may indicate ADHD or may be related to his stroke and/or headaches. (Dkt. 10-7 at 88, R. 354). Dr. Evans concluded that Robert had limitations from his mental disorders, including a below average attention span and a below average tolerance to stress. (Id.). Based on Robert's allegations and the attention deficits observed by the state agency consultant, it is not apparent why a 10% off-task limitation would address Robert's symptoms, and the ALJ provides no explanation on this point. This error on the ALJ's part is not harmless, because the vocational expert testified at the

hearing that a 20% off-task limitation would be entirely work-preclusive. Without any sufficient explanation, the ALJ's error is material and the Undersigned recommends that the Court remand for a proper consideration of how long Robert would be off-task during the workday.

The Plaintiff also argues that the ALJ's hypothetical to the vocational expert did not fully capture his marked limitations with respect to concentration, persistence, and pace. (Dkt. 12 at 25). As previously discussed, the ALJ's RFC fell short due to a failure to adequately discuss and support the 10% off-task calculation; as such, the hypothetical question, which was based on that same RFC, fails as well. *See Lanigan v. Berryhill*, 865 F.3d 558, 566 (7th Cir. 2017) (citing *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir. 2004) (a hypothetical question based on a faulty RFC is also faulty). The Undersigned recommends that if the Court remands for a more thorough consideration of Robert's off-task time, the ALJ also be ordered to reconsider the hypotheticals presented to the vocational expert concerning Robert's limitations in concentration, persistence, and pace.

## C. Subjective Symptom Analysis

Finally, Plaintiff argues that the ALJ erred when considering his subjective symptoms under Social Security Ruling 16-3p. (Dkt. 12 at 29-35). Specifically, Robert takes issue with the ALJ's consideration of his headaches. (Id. at 30). The Commissioner maintains that the ALJ's 16-3p analysis is supported by substantial evidence. (Dkt. 13 at 17-20).

"In evaluating a claimant's credibility, the ALJ must comply with SSR 16-3p and articulate the reasons for the credibility determination." *Karen A. R. v. Saul*, No. 1:18-cv-2024-DLP-SEB, 2019 WL 3369283, at *5 (S.D. Ind. July 26, 2019). SSR 16-3p describes a two-step process for evaluating a claimant's subjective symptoms.[3] First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). Second, the ALJ must evaluate the intensity and persistence of a claimant's symptoms, such as pain, and determine the extent to which they limit his ability to perform work-related activities. *Id.* at *3-4.

A court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510 (internal quotation marks and citation omitted). To satisfy this standard, the ALJ must justify his subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and build an "accurate and logical bridge between the evidence and conclusion." *Villano,* 556 F.3d at 562. An ALJ's evaluation is "patently wrong" and subject to remand when the ALJ's finding lacks any explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th

---

[3] SSR 16-3p became effective on March 28, 2016, (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *13, replacing SSR 96-7p, and requires an ALJ to assess a claimant's subjective symptoms rather than assessing his "credibility." By eliminating the term "credibility," the SSA makes clear that the "subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 2016 WL 1119029 at *1. The Seventh Circuit has explained that the "change in wording is meant to clarify that administrative law judges are not in the business of impeaching a claimant's character." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

Cir. 2014); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008); *Cassandra S. v. Berryhill*, No. 18-00328, 2019 WL 1055097, at *5 (S.D. Ind. Mar. 6, 2019).

At step two of the Rule 16-3p analysis, the ALJ considers the claimant's subjective symptom allegations in light of the claimant's daily activities; the location, duration, frequency, and intensity of pain and limiting effects of other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve pain. 20 C.F.R. § 404.1529(c)(3). Although the Court will defer to an ALJ's subjective symptom finding that is not patently wrong, the ALJ must still adequately explain his subjective symptom evaluation "by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367. Without this discussion, the Court is unable to determine whether the ALJ reached her decision in a rational manner, logically based on her specific findings and the evidence in the record. *Murphy*, 759 F.3d at 816 (internal quotations omitted); *see also* SSR 16-3p, at *9.

When assessing a claimant's subjective symptoms, ALJs are directed to "consider the consistency of the individuals own statements. To do so, [they] will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *8. The ruling also explains that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments,

referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." *Id*. at *9.

After considering Robert's statements, the ALJ concluded that Robert's statements were not entirely consistent with the record. (Dkt. 10-2 at 29, R. 28). In his opinion, the ALJ provided the following analysis as to Robert's subjective symptoms regarding his headaches:

> Although claimant has been diagnosed with headaches and cerebral venous thrombosis, examinations have been largely normal. In physical examinations, claimant has regularly been found to be oriented to person, place, and time; with no atrophy, with normal muscle strength in the upper and lower extremities; and with normal balance (Exhibits 3F, pg. 3; 6F, pgs. 13, 18; 9F, pg.4; 13F, pg. 5; and 14F, pg. 2). Further, the record indicates that conservative pharmacological care has addressed claimant's headaches. Claimant has stated that he was happy with his medications, that they were working well, and his situation was stable (Exhibit 6F, pgs. 17, 18). In 2017, claimant's medications were changed when he was diagnosed with cluster headaches and he was placed on oxygen treatment, Amitriptyline, and Verapamil (Exhibit 8F, pg. 1; 12F, pg. 1; and 13F, pg. 1). The record indicates this treatment also provided relief and that oxygen in particular decreased his symptoms (Exhibits 8F, pg. 1; 12F, pg. 1; and 13F, pg. 1). In 2017, claimant reported that his headaches were more manageable (Exhibit 6F, pg. 4). In July of 2019, claimant reported that he was experiencing headaches but he indicated the frequency with which he received headaches had been reduced and that they were not usually as bad (Exhibit 13F, pg. 8).
>
> . . .
>
> The claimant's activities of daily living also suggest a higher level of functioning than alleged by the claimant. Despite his alleged symptoms, the claimant provides his own personal care, he spends time with his children, he is able to use a computer, he does light housecleaning, he can go out alone, he can go shopping, he can prepare simple meals, he can manage his own finances, and he regularly interacts with others (Exhibit 6E, pgs. 3, 4, 5 and 7F, pg. 3). These

activities indicate a greater level of functioning than the claimant's subjective symptoms would suggest.

(Dkt. 10-2 at 30-31, R. 29-30). The Court can glean four reasons the ALJ gave to support his finding of inconsistency: (1) conservative treatment; (2) improvement with treatment; (3) normal physical and mental examinations; and (4) activities of daily living. (Id.).

First, the ALJ's assertion regarding conservative treatment is troubling. There is no medical professional in the record, either treating or state agency, who has characterized Robert's treatment as "conservative" and it is not clear from reading the ALJ's opinion what treatment would or would not be considered conservative for an individual like Robert who has dealt with migraine and cluster headaches and, more importantly, why it would matter for evaluating Robert's subjective symptoms. *See Corey Z.*, 2019 WL 6327427, at *8 (ALJ erred by concluding that claimant's treatment was conservative without providing any explanation or support and by not relying on an expert opinion).

Second, the ALJ states multiple times that Robert's headaches are adequately addressed by his treatment regimen and that his headaches are managed. (Dkt. 10-2 at 30-31, R. 29-30). The ALJ, however, leaves out important context for his claim that Robert's headaches have been addressed by his treatment. Robert has had to switch medications multiple times due to waning effectiveness or unpleasant side effects (Dkt. 10-7 at 86, 101, R. 352, 367), and the ALJ fails to acknowledge that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments,

23

referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *9. Even with treatment for headaches since he was around 10 years old, Robert continues to have debilitating headaches. (Dkt. 10-2 at 52, R. 51).

Moreover, there is no medical evidence that the Plaintiff's treatment addressed his headaches. In fact, Robert testified at the disability hearing that he continues to have regular headaches that are managed with over-the-counter medication, but also that he has the more intense cluster headaches which occur on average three times in a day, if he is not in the summer season. (Dkt. 10-2 at 51-52, R. 50-51). While Robert did testify that sometimes his headaches only last for a few minutes, he went on to say that the after-effects, including brain fog and fatigue, can make him "completely worthless," especially if he does not immediately sleep after the headache. (Dkt. 10-2 at 52-53, R. 51-52). The ALJ does not grapple with the Plaintiff's symptoms that do not support his conclusion, and thus the ALJ's claim that the Plaintiff's symptoms are addressed or managed by his treatment plan is not supported by the record.

Next, the ALJ relies heavily on normal physical and mental examinations to discount Robert's alleged symptoms. (Dkt. 10-2 at 30-31, R. 29-30). Even if Robert had none of the symptoms noted above during his medical examinations, this may only suggest that Robert did not have a headache at the time of the appointment, rather than revealing anything about the frequency or severity of his headache

symptoms. *See Christina B. v. Kilolo Kijakazi*, No. 1:20-cv-01936-DLP-JRS, 2022 WL 178606, at *7 (S.D. Ind. Jan. 20, 2022) (citing *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014) (the fact that the claimant had no headache on examination said nothing about the frequency and severity of her migraines). Perhaps most importantly, no medical source opined that normal mental or physician examinations were inconsistent with complaints of severe headache symptoms. *See Wessel v. Colvin*, No. 4:14-cv-00055-SEB-DML, 2015 WL 5036775, at *6 (S.D. Ind. Aug. 4, 2015) (ALJ's conclusion unsupported where no doctor suggested normal imaging or normal physical presentation was inconsistent with severe migraine symptoms); *Chavez v. Colvin*, No. 1:14-cv-192, 2015 WL 1733767, at *11 (N.D. Ind. Apr. 15, 2015) (same); *Suhsen v. Saul*, No. 20-CV-519-JDP, 2021 WL 1921434, at *5 (W.D. Wis. May 13, 2021) (same). As in *Christina B.*, "[t]he ALJ's reliance on objective medical imaging and neurological testing is misplaced in this case, largely because h[is] own treating physicians accepted h[is] symptom allegations and treated h[im] for those same symptoms. Thus, the ALJ's conclusion regarding the importance of normal objective medical evidence is not supported by the record." 2022 WL 178606, at *8.

Finally, the ALJ concluded that Robert's activities of daily living suggested a higher level of functioning than he alleged. (Dkt. 10-2 at 31, R. 30). First, Robert listed his daily activities at the hearing, and noted that he could only complete them *if he did not have a headache that day*. (Dkt. 10-2 at 57, R. 56). The ALJ never addresses this point in his opinion, but concludes that Robert can complete all listed

tasks on a daily basis. Instead, Robert actually testified that on a typical day, he has a headache in the morning; only if he does not have a headache, he helps his wife with the baby and will try to accomplish some tasks like dishes or laundry, but he rarely finishes them because he cannot stay on-task. (Id. at 57, R. 56). Depending on the headache season he is in, he could have anywhere from three to eight headaches in a day that would require use of his oxygen machine. (Dkt. 10-2 at 62, R. 61). Bright lights, including those at concerts or vehicle headlights, all trigger the headache aura; loud sounds, especially high-pitched sounds, cause headaches and render him unable to handle sound, light, or any touching. (Dkt. 10-2 at 58-59, R. 57-58). He had to leave his honeymoon due to his headaches (Dkt. 10-2 at 51-52, R. 50-51); had to leave two concerts because the lights triggered a headache (Dkt. 10-2 at 54, R. 53); avoided concerts after that due to the fear of not having anywhere to go if a headache suddenly appeared (Id.); and he does not drive without his wife in the car for fear of a headache. (Dkt. 10-2 at 56, R. 55). He further testified that he needs his wife's help for most activities and that most of his day is waiting for his wife to come home from work. (Dkt. 10-2 at 56-57, R. 55-56).

On a headache questionnaire filled out by Robert's wife, she noted that before a headache starts Robert gets irritable and grumpy and is not able to concentrate and loses focus easily. (Dkt. 10-6 at 3, R. 202). She notes that Robert's headaches start suddenly and that Robert will not be able to do much until after the headache has ended, but also that he will usually be so exhausted afterward that he will need to sleep. (Id). She further notes that a looming headache "can make it hard to get

out of the house from fear of having one in public or around people that don't understand. It impacts everything and has caused lots of canceled plans. He cannot do anything that requires him to drive or move very far where he is at." (Id. at 3-4, R. 202-03). His wife further confirmed on a Third-Party Function Report that Robert no longer drives due to his sensitivity to bright lights. (Dkt. 10-6 at 19, R. 218). At his consultative exams with Dr. John Nieters and Dr. Karl Evans, Robert reported similar limitations: that he is unable to remember simple tasks such as his wife's food order; cannot remember what he has read; becomes irritable and does not like to be touched; is sensitive to light and sound, both of which cause headaches; and does not drive for fear of a headache. (Dkt. 10-7 at 86-87, 90, R. 352-353, 356).

Activities of daily living, "like those cited by the ALJ, are unlike work tasks as they are performed by a claimant when his pain and symptoms are least severe, with rest, the assistance of others, and not monitored by a supervisor." *April W. v. Kijakazi*, No. 1:21-cv-197, 2022 WL 190659, at *11 (N.D. Ind. Jan. 21, 2022) (citing *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). Here, as in *April W.*, the ALJ merely recited some of Plaintiff's supposed daily activities without noting the difficulties that Plaintiff encounters when attempting to perform them. As such, the ALJ's explanation is not a meaningful analysis nor supported by the record.

In this case, the ALJ's stated reasons for discounting Robert's symptom allegations are not supported by the record. As such, the Undersigned recommends that the Court remand for the ALJ to conduct a proper credibility analysis.

## V.    CONCLUSION

For the reasons detailed herein, the Undersigned recommends that the ALJ's decision denying Plaintiff benefits be **REVERSED** and **REMANDED** for further proceedings.

Any objections to the Magistrate Judge's Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for such failure.

So RECOMMENDED.


Date: 2/16/2022

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana


Distribution:

All ECF-registered counsel of record via email